UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SIDNEY E. PURDIE,

                                        Plaintiff,

            vs.                                                    9:09-CV-971
                                                                   (GTS/ATB)

HAROLD D. GRAHAM, *et al*,

                                        Defendants.

_____

SIDNEY E. PURDIE, Plaintiff *pro se*
ADRIENNE J. KERWIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).  Plaintiff alleges in his "Second Amended and Supplemental Complaint"(AC)[1] that, while he was incarcerated at Auburn Correctional Facility (Auburn), defendants Connors, and Vosburg,[2] retaliated against him for writing a grievance against Vosburg by denying plaintiff food and recreation.  Plaintiff also alleges that defendant Vosburg paid another inmate with cigarettes to assault plaintiff on August 4, 2009, after defendant Guzewicz opened the cell doors. (AC; Dkt. No. 20).  Plaintiff seeks monetary and injunctive relief.

_____

        [1] Although technically, the pleading has been called a Second Amended and Supplemental Complaint, for ease of reference the court will cite it simply as the Amended Complaint (AC).

        [2] Plaintiff spelled this defendant's name "Vosberg."  However, the proper spelling of his name is "Vosburg," and the court will refer to the defendant with the proper spelling of his name.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 59). Plaintiff has filed a response in opposition to the motion which includes, what plaintiff refers to as a motion for an "Order of Protection." (Dkt. No. 62). For the following reasons, this court agrees with two of the defendants and will recommend dismissal of the amended complaint in its entirety as to defendants Guzewicz and Conners. With respect to defendant Vosburg, the court will recommend dismissal of the retaliation claims that are based upon alleged denials of food and recreation, but will not recommend granting summary judgment as to the claims based on defendant Vosburg's alleged role in another inmate's August 4, 2009 assault on plaintiff. To the extent that plaintiff seeks some type of injunctive relief, the court will recommend its denial.

## DISCUSSION

### I.   <u>Facts and Procedural History</u>

Plaintiff filed his original complaint, naming nineteen defendants. (Dkt. No. 1). The complaint contained a multitude of claims, including the denial of adequate medical care and harassment. (Dkt. No. 1). Plaintiff's application to proceed *in forma pauperis* (IFP) was denied initially without prejudice by the Honorable Glenn T. Suddaby, based upon plaintiff's failure to properly complete the IFP paperwork and because many of his allegations did not state proper claims for relief.[3] (Dkt. No. 5).

---

[3] Judge Suddaby also noted that some of plaintiff's claims seemed to be similar to another case filed by plaintiff in the Northern District of New York. (Dkt. No. 5 at 2-3). Judge Suddaby ordered plaintiff to "show cause as to why some or all of the claims asserted in this action are not duplicative of the claims asserted in . . . *Purdie v. Graham*, 09-CV-0951-FJS-GJD (N.D.N.Y. filed Aug. 21, 2009)." (*Id.* at 13).

Plaintiff was given the opportunity to submit an amended complaint for the court's review. (*Id.* at 13).

After attempting[4] to file an "Amended Complaint" that did not comply with Judge Suddaby's order, plaintiff filed a motion to file a "Second Amended and Supplemental[5] Complaint." (*See* Dkt. No. 19, Judge Suddaby's Order regarding the amended and second amended complaints). On July 20, 2010, Judge Suddaby granted IFP and ordered the Clerk to file and serve the Second Amended and Supplemental Complaint. (Dkt. No. 19). In the new pleading, plaintiff eliminated eight of the original nineteen defendants, and Judge Suddaby dismissed the action as against those individuals. (Dkt. No. 19 at 6). The court also eliminated defendants, "J. Festa" and "Richard Roy" because plaintiff stated that they were not meant to be named as defendants, but rather as witnesses for plaintiff. (See Dkt. No. 19 at 6 n.2, 7). The plaintiff added a new defendant, and the court dismissed another defendant on the merits. (Dkt. No. 19 at 7).

On September 10, 2010, the defendants who were served as the result of Judge Suddaby's July 20, 2010 Order, moved to dismiss the Amended Complaint pursuant to

---

[4] The insufficient amended complaint was stricken by Judge Suddaby's July 20, 2010 order which granted IFP and ordered service of the Second Amended and Supplemental Complaint that is now the operative pleading in this case. (Dkt. No. 19 at 2).

[5] The court recharacterized plaintiff's motion and noticed that some of the events in the second amended complaint occurred after plaintiff filed the original complaint, making the document both an amended and a supplemental complaint.

Fed. R. Civ. P. 12(b)(6).[6]  (Dkt. No. 32).  On January 19, 2011, I recommended

dismissing all defendants and related claims, except defendants Vosburg, Conners,

and Guzewicz, together with the claims filed against them. (Dkt. No. 51).  Judge

Suddaby adopted my Report-Recommendation on March 16, 2011. (Dkt. No. 53).

The present motion for summary judgment was filed on July 5, 2011 on behalf of the

three remaining defendants. (Dkt. No. 59).

     In the remaining claims,[7] plaintiff alleges that while he was incarcerated at

Auburn Correctional Facility, he filed "numerous complaints" about Officer (C.O.)

Vosburg because he kept asking plaintiff "where the weapons are hidden and who had

the drugs." (AC ¶ I(a)).  Plaintiff alleges that C.O. Vosburg "denied me chow and

recreation for a week straight," so plaintiff wrote to Superintendent Graham.  (AC

¶ I(d)).

     Plaintiff states that C.O. Conners, who is usually C.O. Vosburg's relief officer,

also refused to let plaintiff out for chow and recreation.  (AC ¶ I(f)–(g)).  Plaintiff

claims that when he asked C.O. Conners about these deprivations, he told plaintiff that

he was not complying with Vosburg's rules.  Conners stated that he would "teach"

plaintiff about writing up Conners's co-worker, and that Vosburg "[ran] the gangs and

drugs around the facility." (AC ¶ I (g)–(h)).  Plaintiff also alleges that C.O. Vosburg

told plaintiff to "stay out of [C.O. Vosburg's] business and not intervene in his drug

---

    [6] Defendant Bellamy joined the motion at a later date. (Dkt. No. 49 & Text Order Dtd.
12/28/10).

    [7] There are other allegations in the Amended Complaint, but the court will only summarize the
facts relating to the remaining claims.

move." (AC ¶ I(i)).

Plaintiff alleges that on August 4, 2009, around the time for the noon meal, his cell door was opened by C.O. Guzewicz, and inmate Zebrowski[8] came into plaintiff's cell and stabbed him once above his left eye, twice in his neck, once in his head, once in his left arm, and twice in his right leg. (AC ¶ III(1)).  C.O. Guzewicz noticed that plaintiff was not leaving his cell, and after investigating, saw plaintiff and inmate Zebrowski fighting. (AC ¶ III(2)).  Guzewicz gave numerous orders to break up the fight. (AC ¶ III(2)).  Officers Ramsey and Blaisdell assisted in stopping the altercation.  (AC ¶ III).  Some time later, plaintiff claims that he "was informed" that C.O. Vosburg paid inmate Zebrowski cigarettes so that he would stab petitioner in retaliation for the grievances plaintiff had filed against Vosburg and Conners. (AC ¶ IV).  The remaining claims are failure to protect and retaliation for the exercise of a constitutional right.[9]

## II.  <u>Summary Judgment</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990).  "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary

---

[8] In plaintiff's response to defendant's motion, he states that he was told by Sergeant Graf while the sergeant was escorting plaintiff to SHU after the incident, that the assailant was inmate John F. Zebrowski, who was housed in the cell next to plaintiff. (Dkt. No. 62-1 at 21 (CM/ECF pages)).

[9] Plaintiff has requested that the court "mark all prior exhibits in use for proof to argue these allegations . . . ." (AC at p.9).

judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)

(citation omitted). A dispute about a genuine issue of material fact exists if the

evidence is such that "a reasonable [fact finder] could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial

responsibility of informing the court of the basis for the motion and identifying the

portions of the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

Fed. R. Civ. P. 56 (c)(1)(A).  If the moving party satisfies its burden, the nonmoving

party must move forward with specific facts showing that there is a genuine issue for

trial. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  In determining

whether there is a genuine issue of material fact, a court must resolve all ambiguities,

and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369

U.S. 654, 655 (1962).  However, when the moving party has met its burden, the

nonmoving party must do more than "simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 247-48.

"[I]n a *pro se* case, the court must view the submissions by a more lenient

standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v.

Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v.*

6

*Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a *pro se* party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). "However, a *pro se* party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)).

In support of their summary judgment motion, in addition to their required submissions, defendants have filed declarations by each of the remaining defendants. (Dkt. Nos. 59-3 – 59-5). Defendants have also filed the transcript of plaintiff's deposition[10] and the declaration of Anthony Smith, the Liaison Officer at Auburn. (Dkt. Nos. 59-2, 59-6). Plaintiff has filed the declaration of Judson Watkins, a fellow-inmate "witness" in support of his response to defendants' motion. (Dkt. No. 62 at 7-8). Plaintiff has also filed Exhibits A through Z(4) in support of his response. (Dkt. No. 62-1 at pp. 1-62).

## III.   Retaliation

### A.   Legal Standards

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show first, that he engaged in constitutionally protected speech or conduct, and second, that the protected activity was a substantial motivating factor for

---

[10] The transcript of plaintiff's deposition is Exhibit A to the Affirmation of defense counsel, Adrienne J. Kerwin. (Dkt. No. 59-2). The pages of the deposition transcript are numbered, and the court will refer to the numbers of the deposition pages, not the CM/ECF numbers. The court will not repeat the docket number of the document and will refer only to the transcript as (T. at).

"adverse action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *see also Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  Third, the plaintiff must establish a causal connection between the protected speech or conduct and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).

There is no question that filing grievances qualifies as a "constitutionally protected" activity. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).  The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d at 381 (citation omitted).  This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights.  *Id.*

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.  *Id.*  "Regardless of the presence of retaliatory motive, . . . a defendant may be entitled to summary judgment if he can show . . . that even without the improper motivation the alleged retaliatory action would have occurred."  *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  Accordingly, plaintiff must set forth non-conclusory

8

allegations to sustain a retaliation claim.  *Bennett*, 343 F.3d at 137.

### B.    Application

In this case, plaintiff claims first, that in retaliation for plaintiff filing a

grievance against defendant Vosburg, defendants Vosburg and Connors were

responsible for the denial of plaintiff's food, recreation, and showers for two weeks.[11]

Second, plaintiff alleges that defendant Vosburg "paid" inmate Zebrowski in

cigarettes to attack plaintiff on August 4, 2009.  Defendant Connors is not alleged to

have been involved in the assault incident.

### 1.    Deprivation of "Food," Recreation, and Showers

#### a.    Relevant Factual Background

In his amended complaint, plaintiff alleges only that he "filed *numerous*

*complaints*" against C.O. Vosburg because "he asked me where the weapons are

hidden and who had the drugs." (AC ¶ 1(b)).  Plaintiff then states that C.O. Vosburg

denied plaintiff chow and recreation for "a week straight," and that plaintiff "got tired

of being harassed by this officer so I wrote to the Superintendent . . . ." (*Id.* ¶ 1(e)).

Plaintiff states that after defendant Vosburg "got his days off to where he's not

working 7 Company . . . he pass words to other co-workers to follow up harassing me

while he's not working the 3 to 11 tour." (*Id.* ¶ e)).  Then plaintiff accuses defendant

---

[11] Although the Amended Complaint refers to the "negligence" of defendant Vosburg, it is clear that plaintiff is alleging intentional conduct by this defendant in the retaliation claim. *See* AC at ¶ 1(a).  To the extent that the amended complaint may be interpreted as attempting to raise negligence, such a claim is not actionable in a section 1983 complaint. *See Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under section 1983).  Thus, to the extent that plaintiff is attempting to raise negligence, it may be dismissed.

Connors, who was "usually C.O. Vosburg's relief officer" of refusing to let plaintiff out for food and recreation. (*Id.* ¶ 1(f)).

Plaintiff's allegations are unclear.  As stated above, plaintiff would have to show that there were deprivations amounting to adverse action, that these deprivations occurred *after* the complaints against defendant Vosburg, the defendants knew about the complaints, and that the complaints motivated the defendants to engage in the deprivations.  In the amended complaint, plaintiff does *not* allege *when* he filed the complaints about Vosburg that allegedly motivated the deprivations.  During his deposition, plaintiff testified that his first encounter with defendant Vosburg was when Vosburg approached plaintiff to ask him whether he knew who were the "gang" leaders and who ran the "drug trade" at Auburn. (T. at 8).  Plaintiff then stated that on July 15, 2009,[12] he wrote a "grievance" against defendant Vosburg because plaintiff felt "harassed" by these questions.[13] (T. at 9).

Plaintiff has included various letters as exhibits to his response papers.  The letters complain about defendants Vosburg and Conners, but the letters are *not* formal grievances.  They are letters to outside agencies and individuals. (Dkt. No. 62-1 at

---

[12] This is the first time that July 15, 2009 was mentioned.  It does not appear in the amended complaint.  In his original complaint, plaintiff stated that he wrote complaints on July 19, 21, and 23, 2009 "for trying to involve [plaintiff] into gang and drug activities." (Dkt. No. 1 at ¶ 6).  The original complaint then referred to the August 4, 2009 stabbing incident, but never mentioned the alleged denial of food, recreation, and showers prior to August 4th.  The court would also point out that in his original complaint, plaintiff never claimed that defendant Vosburg paid anyone to assault him.

[13] Plaintiff never actually said that he *filed* a grievance.  His testimony was that he "wrote to the grievance – I wrote to the administration about it because I felt I was being harassed." (T. at 9).  Defense counsel then referred to "that grievance." *Id.*  A "letter" is not necessarily a "grievance," and the terms appear to be used interchangeably.

Exs. V-Y).  The letters complain that defendant Vosburg was "retaliating"[14] against

plaintiff, but allege that the alleged "retaliation" *started* on July 15, 2009, when

plaintiff had not written any grievances or letters complaining about Vosburg.  The

first letter (not a grievance) that plaintiff sent to the IGRC was dated July 23, 2009.

(Dkt. No. 62-1, Ex. X).  Another of plaintiff's exhibits is a letter that he wrote to

Superintendent Graham, dated July 21, 2009, stating that plaintiff had not had an

"evening meal" since July 15, 2009. (Dkt. No. 62-1, Ex. W).  In the July 21st letter to

Superintendent Graham, plaintiff also states that "[t]his is retaliatory by C.O. Vosberg

[sic] who clearly do [sic] not care for human rights or the well being of any staffs [sic]

at this facility or inmates confined living at Auburn Correctional Facility." (*Id.*).  In

the July 21st letter to Superintendent Graham, plaintiff never explains why he believes

that defendant Vosburg's conduct is "retaliatory," and plaintiff has not submitted any

actual grievances as exhibits that were filed *before or after* the alleged denial of food,

recreation, and showers, complaining about defendant Vosburg's prior "harassment,"

that would have been the "motivation" for the deprivations.

The earliest letter that plaintiff includes[15] as an exhibit that was written to

---

[14] Although "retaliation" has a legal definition, the court notes that the word "retaliation" is often used as a generic term when officers engage in any action that the inmate views as adverse to him, regardless of the reason.

[15] Plaintiff's July 19th letter indicates that copies of the letter were sent to "SEP," Superintendent Graham, the Secretary of State, the NAACP, the "Correction Association of New York," the Inspector General, the FBI, the Attorney General, the Center for Law and Justice, Prisoners' Legal Services, and Correctional Counselor Tarnow. (Dkt. No. 62-1 at 49).  Plaintiff must have also sent a letter, dated July 19, 2009 to the Public Integrity Bureau (PIB) because he received a response from the PIB, dated August 11, 2009, but referencing plaintiff's letter of July 19th. (Dkt. No. 62-1 at 42, Ex. S).  The PIB's response does not indicate the substance of plaintiff's July 19th letter,

anyone about the alleged drug and gang discussion was a letter to the "Commission

Department of Correction Services," specifically addressed to Commissioners Mr.

Fred O'Leary & Mr. Daniel Reardon. (Dkt. No. 62-1 at 46-49, Ex. V).  This letter is

dated July 19, 2009 and alleges that on July 15, 2009, defendant Vosburg told plaintiff

to give him some information about "who and what organization is controlling the

drug trade and who has weapons in this facility." (*Id.* at 46).  Plaintiff states that

defendant Vosburg told plaintiff that he wanted to know because "[Vosburg ran] the

drug trade" and that someone was "cutting in" on his business. (*Id.*)  Officer Vosburg

also allegedly wanted to know who the leaders of the "gangs" were. (*Id.*)  Plaintiff

then stated that "[he] was also denied chow and recreation [and he was not] able to

take chowers [sic] . . . because this officer will not let me out of my cell. (*Id.*)  Plaintiff

never mentioned that the reason for this behavior was "retaliation" for any grievances,

because plaintiff never alleges when these "grievances" were filed or how defendant

Vosburg would have found out about them.

Plaintiff's July 19th letter also complains that defendant Vosburg denied

plaintiff recreation and "chow" on the 17th, and that defendant Connors continued the

deprivations on the 18th. (*Id.* at 47).  Plaintiff claimed in the letter that at some point,

defendant Vosburg told plaintiff that he would never have "safe" living conditions

wherever he went at Auburn and that he would never see his mail. (*Id.* at 47, 48).  In

the July 19th letter, plaintiff complained bitterly about his medical condition and stated

---

but stated that the PIB would investigate and evaluate whether there was sufficient basis for
investigation by the Attorney General. (*Id.*)

that he had not had "dinner" since July 15th. (*Id.* at 48).  Plaintiff never discussed grievances that he had written, and clearly, the alleged retaliation began *before* the plaintiff's July 19th letter was written.[16]  Defendant Vosburg could not be "retaliating" for a complaint of which he could not have been aware because it was not yet written.

During plaintiff's deposition, he stated that Vosburg imposed these restrictions "for a whole week," and "Conners [sic] came in and retaliated and burnt me for three or four days." (T. at 14).  Plaintiff testified that after July 15th, he saw Vosburg again on the 17th of July, and that is when he imposed the restrictions on plaintiff. (T. at 16). He only saw defendant Vosburg again when plaintiff was taken to SHU after the assault incident. (T. at 16-18).  Plaintiff testified that after the 17th, it was defendant Connors who enforced Vosburg's restrictions. (*Id.*)  At his deposition, plaintiff claims that he had the conversation about the drugs with defendant Vosburg on July 15th, but then testified that the restrictions were not placed on him until "a little while later," on

---

[16] Plaintiff never alleges that the "retaliation" was for anything other than "written" complaints. (AC ¶ 1(b), (c), (d), (h)).  To the extent that plaintiff's amended complaint may in some way be interpreted as claiming retaliation for the alleged improper answer to defendant Vosburg's questioning on July 15th, it would not support a claim for damages.  Although some courts have held that in certain circumstances, an inmate's refusal to become a "snitch" is constitutionally protected activity, neither the Second Circuit, nor the Supreme Court have ever so held. *See Allah v. Juchenwioz*, 176 Fed. App'x 187, 189 (2d Cir. 2006).  On that basis, the Second Circuit afforded qualified immunity for claims of retaliation based upon this protected activity. *Id.* at 188-89.  Thus, in this case, even if the court were to assume that the purported protected activity was plaintiff's July 15th conversation with Vosburg, the defendant  would be afforded qualified immunity if he "retaliated" by imposing the alleged restrictions on plaintiff (even assuming they are considered adverse action).  Because this court finds that paying an inmate to stab plaintiff would be a separate constitutional violation, regardless of the reason, and is not recommending dismissal against Vosburg, it is not necessary to rule on whether the "conversation" amounted to protected activity.  Plaintiff never alleges that defendant Connors was retaliating against plaintiff for the July 15th conversation. Plaintiff specifically alleges that defendant Connors was "retaliating" for "writing up his co-worker." Thus, this would not affect the court's recommendation of dismissal as against Connors.

the 17th. (T. at 16).  Plaintiff then states that Vosburg left on vacation, and defendant Connors imposed the restrictions. (T. at 16-17).  As defendants argue, that would mean Vosburg only imposed the restrictions "himself" for at most *one* day.  Even assuming that the restrictions began on July 15th, they only lasted under defendant Vosburg for three days, and it is clear from plaintiff's contemporaneous letters, that he was only denied "dinner," not all food.

Plaintiff also testified that he only spoke to Connors once after he "wrote up" Vosburg and then "never no more." (T. at 19).  Plaintiff's July 19th letter states that he spoke to Connors twice, once on July 18th and again on the 19th. (Dkt. No. 62-1 at 47-48).  Plaintiff's July 21st letter to Superintendent Graham states that plaintiff saw defendant Vosburg again on July 21st, when defendant Vosburg allegedly told plaintiff that he was not letting him out for "chow" for three more days. (*Id.* at 50-51, Ex. W).  Plaintiff's letter to the IGRC, dated July 23rd , states that plaintiff saw defendant Vosburg on July 23rd , when he called plaintiff a derogatory name and told him that he was not going to let him out for chow and recreation. (*Id.* at 52-53, Ex. X).  Defendant Vosburg also allegedly told plaintiff that he was never going to get his mail while Vosburg was working on A-Company. (*Id.* at 52).

Plaintiff has included a response that he received from the Commission on Correction, indicating that the Commission received plaintiff's letter on July 23, 2009. (Dkt. No. 62-1 at 54, Ex. Y).  It is a very short letter, telling plaintiff that it was not the intent of the Commission to circumvent the grievance process, and suggested that plaintiff file a grievance, complaining about the denial of "food and recreation time."

14

(*Id.*)

### b.    Application

Although plaintiff states that defendants Vosburg and Connors denied him food, showers, and recreation because plaintiff "wrote up" defendant Vosburg, there is absolutely no evidence that plaintiff ever wrote any grievances against either defendant or even that he wrote letters complaining about either defendant *prior to* the alleged adverse action.  The connection between plaintiff's alleged protected activity (filing letters of complaint or grievances) and the alleged adverse action (denial of food, recreation, and showers) is tenuous at best.  Plaintiff vaguely references "writing up" the defendants, but in all of plaintiff's exhibits, there is not one letter, complaining about the drug and gang questions, that was mailed prior to the alleged deprivations. All the letters submitted by plaintiff are complaining about the denial of food, showers, and recreation.

Plaintiff alleges that his protected activity, causing the retaliation, was filing grievances regarding Vosburg's alleged "harassment" in asking plaintiff to tell him about the drugs and gangs in prison.  Plaintiff appears to have been very insulted and felt harassed by this questioning, but has submitted no grievances that he filed and about which defendant Vosburg would have been aware so that he would have had a reason to retaliate against plaintiff.  A careful review of all the exhibits shows that there is no causal connection between the complaint and the alleged deprivation.  All the "complaints" were about the alleged deprivations themselves and began after the alleged deprivation started, thus, the complaints could not have been a "motivating

15

factor" for the deprivation. This is particularly true for defendant Connors, who plaintiff did not complain about until after Connors allegedly denied plaintiff his meals during the 3 to 11 shift on July 17th.[17]

With respect to whether the alleged "food" deprivations amounted to "adverse action," the court would point out that although plaintiff states in various documents that these deprivations lasted for two weeks, he stated at his deposition that he did not see defendant Vosburg more than once, and plaintiff only saw defendant Connors only three to four times. Plaintiff also was clearly not denied *all* food. At worst, plaintiff was denied dinner for several days. The denial of several meals, showers, and recreation for a few days is insufficient to rise to the level of "adverse action." *See Kearney v. Goord*, No. 09-CV-679, 2011 WL 1260076, at *6 (W.D.N.Y. March 4, 2011) (the denial of several meals is *de minimis*); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629. at *21 (S.D.N.Y. May 29, 2007) (isolated or sporadic denial of privileges such as recreation do not suffice to state a claim of actionable retaliation, while *routine* denial of showers and recreation survived a motion to dismiss retaliation claim) (Report-Recommendation), *adopted by* 2007 WL 2050301 (S.D.N.Y. July 18, 2007)). Thus, in addition to the lack of a causal connection to the denial of food,

---

[17] *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance in which she was not personally named) (collecting cases).

recreation, and showers, it is questionable that the defendants conduct amounted to adverse action.[18]

It is questionable that there were any deprivations at all, although it is not necessary for this court's decision to make that determination. The court would only point out that defendants submit the declaration of Anthony Smith, the Liaison Officer at Auburn Correctional Facility, whose duties include searching for documents at the request of the Attorney General in connection with litigation involving an inmate. (Smith Decl. ¶ 1, Dkt. No. 59-6). Officer Smith states that he was asked to look through the log books for plaintiff's housing unit for July of 2009. (*Id.* ¶ 2). Officer Smith was asked to look for any indication in the log books that plaintiff was denied a meal, recreation, or shower. *Id.* Officer Smith states that there is nothing in the log book indicating any deprivation at all, and that pursuant to DOCS and Auburn procedures, if plaintiff had refused or was not given a meal, recreation, or showers, it would be documented by the gallery officer in the housing company log book. (*Id.*

---

[18] The same would be true to the extent that the court interpreted a separate Eighth Amendment claim based on the denial of food, recreation, and showers. *See e.g. McLeod v. Scully*, No. 81 Civ. 3139, 1984 WL 692, at *2 (S.D.N.Y. July 30, 1984) (citing *inter alia Todaro v. Ward*, 565 F.2d 48, 54 (2d Cir. 1977) (provision of two meals per day during an 8-10 day lockdown did not rise to the level of an Eight Amendment violation). The Second Circuit has stated that "while no court has explicitly held that denial of food is a *per se* violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Abascal v. Fleckenstein,* No. 06-CV-349, 2008 WL 328653, at *6 (W.D.N.Y. Aug. 7, 2008) (quoting *Williams v. Coughlin*, 875 F. Supp. 1004, 1010 (W.D.N.Y. 1995) (internal quotations omitted). The court in *Abascal* also distinguished between the denial of "food" and single meal deprivation. *Id.* Although plaintiff in this case states that he was denied "food," it is clear that he was allegedly only denied "dinner" and that other inmates gave him food. Temporary denial of recreation or shower rights also does not rise to the level of an Eighth Amendment violation. *See Suarez v. Kremer*, No. 03-CV-809, 2008 WL 4239214, at *8 (W.D.N.Y. Aug. 7, 2008) (citing *inter alia Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703 (S.D.N.Y. March 27, 2007)).

¶¶ 2-3).  Officer Smith also checked to see if plaintiff had been confined to his cell in July of 2009 for any disciplinary reason, but found that he was not so confined.  (*Id.* ¶ 4).

In plaintiff's opposition papers, he has submitted the affidavit of inmate Judson Watkins, who states that in August of 2009, he witnessed Officer Vosburg "and other officers" deny plaintiff recreation, "chow," and showers.  (Dkt. No. 62-1 at 1).  Inmate Watkins also states that he witnessed other inmates give plaintiff food, so that he was not denied food.  Inmate Watkins stated that this occurred over a period of two weeks. (*Id.*)  However, plaintiff claims that the deprivations occurred in July of 2009. Plaintiff was assaulted by the other inmate on August 4, 2009, was taken out of the housing unit, and did not return there.  Inmate Watkins could not have witnessed anyone deprive plaintiff of food or any other privilege for two weeks in August.

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit held that although courts have a duty not to weigh the credibility of the parties at the summary judgment stage, there are exceptions in cases in which plaintiff relies almost exclusively on his own testimony, "much of which is contradictory and incomplete," where it is impossible for the court to determine whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.  In this case, plaintiff's account contradicts his own documentary evidence, and plaintiff was no longer on the housing unit when his witness claims that he saw defendant Vosburg enforce the alleged deprivations.

Thus, based on the record, including plaintiff's deposition and the exhibits that

18

he has produced in his response to defendant's motion, this court finds that plaintiff has not raised a genuine issue of material fact with respect to his retaliation claim regarding the denial of "food, recreation, and showers," and that claim may be dismissed as against both Vosburg and Conners.

### 2.   "Paying" Inmate to Stab Plaintiff

Defendants concede that paying an inmate to stab plaintiff would constitute adverse action in connection with a claim for retaliation. (Def.s' Memo. of Law at 3 n.1).  It would also constitute a separate Eighth Amendment claim because if a corrections officer "paid" someone to stab plaintiff, the conduct would be malicious, and the defendant would be aware of, and be deliberately indifferent to, a serious risk of harm to plaintiff.[19]

Plaintiff claims that he has witnesses who will testify that defendant Vosburg tried to offer them cigarettes to attack plaintiff, but that they declined, while apparently Inmate Zebrowski accepted the offer.  In his declaration, defendant Vosburg states that he "had no prior knowledge that the stabbing was going to happen,

---

[19] Whether analyzed in terms of failure to protect, as discussed below, or as an "excessive force" claim, the result would still be the same.  The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).  Whether the assault was committed by the officer himself or whether the officer "paid" an inmate to assault plaintiff, in the appropriate circumstances, the Eighth Amendment standard would be violated.  The malicious use of force to cause harm violates the Eighth Amendment regardless of the seriousness of the injuries. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir.1999) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  The Eighth Amendment standard for a failure to protect requires plaintiff to show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

and [he] did not ask any individual to cause physical harm to the plaintiff." (Vosburg Decl. ¶ 7; Dkt. No. 59-5).  Plaintiff's retaliation claim is weakened by the fact that there is no evidence of a grievance or complaint of which defendant Vosburg would be aware that started the alleged retaliation.  However, plaintiff did eventually file complaints against defendant Vosburg of which he may have become aware before the attack that occurred on August 4th.  Moreover, if in fact, defendant Vosburg paid an inmate to stab plaintiff for *any reason*, it would rise to the level of an Eighth Amendment violation.  Thus, this court will not recommend granting summary judgment on the claim that defendant Vosburg paid an inmate to attack plaintiff based on the existing record.

While the court will not recommend granting summary judgment as to defendant Vosburg, plaintiff does not allege, and there is absolutely no indication that defendant Connors knew anything about the assault incident.[20]  Thus, the court will recommend granting defendants' motion with respect to defendant Connors.

## IV.   **Failure to Protect**

### A.   **Legal Standards**

In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk

---

[20] For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell*, 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  The court finds that plaintiff has alleged no personal involvement by defendant Connors in the assault incident.

of serious harm, **and** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety.  *Id.* at 837.  The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference.  *Id.*

An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, 99 Civ. 1674, 2000 WL 1372834, at *4 (citing *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985)).  Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)).  "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of "a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993

WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

### B.    Application

In his amended complaint, plaintiff states that on August 4, 2009, "I was sleeping in my cell, approximately *noon chow*, my cell was opened by C.O. C. Guzewicz and inmate John Zebrowski came in my cell and stabbed me in the left eye (above eye)." (AC ¶ III(1) (emphasis added)).  At his deposition, plaintiff testified that the cells were being opened "for *morning meal* or program." (T. at 19) (emphasis added).  Plaintiff also stated that defendant Guzewicz opened the cells from a "control box" at "the front of the company." (T. at 20).  In response to defense counsel's questioning how plaintiff knew that it was defendant Guzewicz who opened the door since plaintiff could not see the person who pressed the button, plaintiff stated that he "assumed" that the individual who opened the cell doors was defendant Guzewicz because he was the "on post officer" whose job it was to open the cells in the morning. (*Id.*).  Plaintiff also testified that defendant Guzewicz's voice was the first one that he heard running down the company yelling for help. (T. 22-23).

Plaintiff testified only that defendant Guzewicz opened the cell doors as he did every morning to let the inmates out for their morning meal or programs.[21]  Plaintiff *never* claims that defendant Guzewicz was aware of the alleged agreement between defendant Vosburg and inmate Zebrowski to attack plaintiff.  Plaintiff also states that

---

[21] Whether the incident happened first thing in the morning or at noon, the result is the same. Defendant Guzewicz is not alleged to have been aware that plaintiff was at risk for assault or that he had any enemies on the unit.

he never had any prior problems with the individual who stabbed him (T. 32)[22], so defendant Guzewicz would not have been aware of, and disregarded, *any* risk to plaintiff, let alone the "excessive" or "pervasive risk," required by the constitutional standard cited above.

Defendant Guzewicz has filed a Declaration in support of defendants' motion for summary judgment, asserting that on August 4, 2009, he was stationed in the control room of plaintiff's cell-block and operated the controls that opened inmates' cells. (Guzewicz Decl. ¶¶ 3-4; Dkt. No. 59-4).  Defendant Guzewicz states that on August 4, 2009, he used those controls to open the cell doors to release the inmates for "a meal." (*Id.* ¶ 5).  Defendant Guzewicz then states that, as he left the landing, he heard yelling and observed plaintiff and another inmate fighting in plaintiff's cell. (*Id.* ¶ 6).  The defendant called for help while running toward plaintiff's cell. (*Id.* ¶ 7). Orders were given for the inmates to separate. (*Id.* at ¶ 8).  The inmates complied with the order, and plaintiff was immediately taken to receive medical attention. (*Id.* ¶¶ 8-9).

Defendant Guzewicz states that he was not aware of any grievances that plaintiff may have written against either defendant Vosburg or Connors. (*Id.* ¶ 10). Defendant Guzewicz's statement is completely consistent with plaintiff's description

---

[22] Plaintiff testified that he did not understand why this individual would have stabbed him because there was "something wrong here. . . . This person that [sic] assaulted me was my friend every day.  I used to smoke cigarettes with him, pass our food, drink coffee, then you just stab me up? No, there's something wrong there." (T. at 32).  If plaintiff was not aware of a problem with inmate Zebrowski, and in fact, considered him a "friend," then defendant Guzewicz certainly would not have been aware of any risk.

of the events of August 4, 2009.  There is no evidence that defendant Guzewicz had

any knowledge of any danger to plaintiff.  Thus, the amended complaint should be

dismissed in its entirety as against defendant Guzewicz.[23]

## V.   **"Order of Protection"**

Plaintiff's response to defendants' motion contained what he referred to as a

request for an "Order of Protection." (Dkt. No. 62).  In his papers, plaintiff states that

he would like the court to "safeguard" the "lives" of his "witnesses." (Dkt. No. 62 at

2).  Plaintiff is no longer incarcerated at Auburn Correctional Facility, where the

above events took place.  Additionally, other than Mr. Watkins, plaintiff lists no

"witnesses" whose lives would be in danger.  Plaintiff also asks that the court prevent

his "witnesses" from being cross-examined by defendants or their attorneys unless

someone from the court is appointed to "be present during the hearings." (*Id.*)

Even assuming that the court could issue such an order, plaintiff has not shown

who his witnesses are or why he believes that their lives are in danger.  He includes as

an exhibit a letter that he alleged was received from the Center for Law and Justice,

warning plaintiff that his witnesses were in danger. (Plf.'s Ex. T; Dkt. 62-1 at 43).

A review of this "letter" shows that it is simply a form-notice that the Center for

Law & Justice was terminating it's "Prisoner Mail Program." (*Id.*)  It is not a personal

---

[23] Even assuming that defendant Vosburg "paid" another inmate with cigarettes to stab
plaintiff, there is no indication that defendant Guzewicz was aware of this.  Thus, although the court
is recommending denial of the summary judgment motion as to defendant Vosburg, it does not affect
the court's decision regarding the other two defendants.  Defendant Connors is not alleged to have
any knowledge of the stabbing incident and is not alleged to have been working at the time.  Thus,
there is no failure to protect claim asserted against defendant Connors.

letter to plaintiff, and although it has some handwritten comments at the bottom about an investigation, there is nothing about danger to witnesses.  Interestingly, plaintiff submitted the same form-letter, with different motion for an "order of protection" on March 22, 2010. (Dkt. No. 18 at 3).  The handwriting at the bottom of the form-letter appears to be the same, but the message is different, and one of the handwritten lines (written perpendicularly to the typed text) says "-witnesses are in danger." (*Id.*)  It is unclear why anyone would send plaintiff such a letter if it were true that someone were in danger, and the court seriously questions the letter's authenticity. Additionally, although plaintiff claimed that the letter was from Alice Green, Ph. D., the form-letter states that the memorandum is from "Center Staff," and there is no date or signature on it.  Thus, plaintiff has not shown that an injunction would be appropriate.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 59) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY** as against defendants **CONNORS AND GUZEWICZ**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 59) be **GRANTED IN PART AND DENIED** as against defendant **VOSBURG** as explained above, and it is

**RECOMMENDED**, that to the extent that plaintiff's response (Dkt. No. 62) can be interpreted as is requesting injunctive relief, it be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February 29, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge